## BOSSE *v.* KOEHLER ET UX.

[No. 470, September Term, 1970.]

*Decided June 25, 1971.*

594

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*Arthur A. Anderson, Jr.,* for appellant.

*Morris Turk,* with whom were *Warren B. Duckett, Jr.,* and *Turk, Manis & Duckett* on the brief, for appellees.

SMITH, J., delivered the opinion of the Court.

Appellant, Hammond E. Bosse (Bosse), a builder, contracted to sell to appellees, Melvin C. Koehler and Jeanette D. Koehler, his wife, (the Koehlers) a home in Anne Arundel County "to be constructed with workmanship and materials comparable to" a specified home in the same development. Although the contract did not mention water supply, it is conceded that it was intended, as Bosse puts it in his brief, that the Koehlers were to receive "useable water". We shall here affirm a judgment entered in the Circuit Court for Calvert County in favor of the Koehlers against Bosse in the amount of $1350.00, the amount paid by them for a new well.

The Koehlers made settlement for the property on May 21, 1968, the same day on which the well was drilled. They moved in the first week of June, at which time they

found that "the water was muddy and sandy." Upon the advice of Bosse, they let it keep running, but it did not clear up. The well driller returned. Problems continued. Health department analyses at various times showed nitrite and nitrate concentrations above the "desirable range", and at least one report showed a free ammonia content above that range. The health department report form comments as follows:

> "Nitrogen—The main purpose of nitrogen examination is to determine the amount of decomposing organic matter present. In any event, it is a warning of possible pollution and the sanitary quality of a water. The nitrogen is broken down into Aluminoid, Ammonia, Free Ammonia, Nitrites and Nitrates."

It gives the significance of the nitrite reading as:

> "Represent organic matter undergoing bacterial oxidation."

Relative to nitrate it comments:

> "Organic pollution has been completely mineralized."

At some times the water was reported as "bacteriologically safe for drinking purposes", while at other times it was reported as contaminated. The color of the water seems to have differed substantially from what one normally expects for drinking water. The Anne Arundel County Health Department commented in a form letter to Mr. Koehler on July 19, 1968:

> "The organisms, the appearance of which cause us to give your supply an unsafe rating, are in themselves harmless. However, they serve as a warning that something is getting into the supply which should not be there. The contamination may range from just residual dirt intro-

duced during construction or repair to active infiltration or animal or human waste."

On February 19, 1969, the same department advised Mr. Koehler by other than form letter:

"A chemical analysis has been made of a water sample taken from your well on February 3, 1969. The results of the sample indicate that nitrite and nitrate contents are slightly excessive. Since previous bacteriological samples have indicated contaminated conditions of the water supply, we highly recommend that steps be taken toward chlorination of the water supply. The alternative is to drill a new deep water well."

A subsequent report relative to a sample taken on April 14, 1969, showed that as of that date the water was free of contamination. That report was forwarded on April 16. By that time the die appears to have been cast, however, because on May 8 a well driller other than the driller employed by Bosse applied to the Department of Water Resources for a permit to drill a well which was completed on May 29, 1969. It ultimately produced clear, potable water. An interesting sidelight of the case is that Bosse now employs as the well driller for his houses the driller whom the Koehlers hired in lieu of the one who drilled the first well.

The trial judge in his opinion said in pertinent part:

"Now the facts in this case seem to disclose to me that for some reason the well originally installed on this lot did not behave the way it was supposed to behave. Every once in a long time a drilled well, or driven well, or whatever you want to call them, artesian wells if they are flowing, doesn't behave the way they are intended to behave. Since the source of the trouble is under a lot of opaque earth, you just can't pull it up and examine it or you can't go down

there and look at it. The only thing we do know in this case is that, having been installed and having been poisoned with chlorine to remove it of the contamination which may have been left by the construction or inherent in the materials used, it ran pure for a while, although it didn't take any prizes for appearance, and then after some time it became impure or contaminated again.

"Now since that could not happen by anything in the source of the water, it had to come from the surface or some area near the surface. And this would indicate to me that for some reason this well didn't seal the way these wells are supposed to seal. Perhaps that would not have been a problem, except for the fact that this well was on a lot which received water from higher ground and perhaps that wasn't the reason at all, nobody really knows. All we do know is the well didn't work. I don't mean to be standing for the proposition that a homeowner can go out and order $1350.00 worth of work done on somebody else's account without giving that person a chance to correct the situation at his own prices. But two things I consider important about this, first is you don't lay out $1350.00 if you are the ordinary type person if you are not sure that you are going to get it back, unless you have got a reason for doing it. You have got to be pretty well upset with the water supply if you think somebody else is supposed to furnish it and you go and correct it to that extent.

"Generally speaking when the householder is putting out the money, he takes the least expensive way to correct the problem, not the most expensive way. And so, although there is some question about the accuracy of these samples, we are inclined to think that a $1350.00 bill

paid by the householder is some evidence of his good faith in being afraid of the water. Whether he was reasonable in that fear or unreasonable, we think it was to him a real fear or he wouldn't have spent that kind of money.

"Now under the circumstances we would have required and would require in dealing with clients and just common sense indicates that a person ought not to spend that kind of money on the account of another without first warning him and giving him a chance to make good on his agreement. The difficulty I have with that is that by everybody's testimony and admission on the Defendant's side and by the written evidence in the case, at this point Mr. Bosse had become so aggravated with the Plaintiffs in this case that he just couldn't do business with them any more. * * *

"Things having come to that pass, we think the Plaintiff was powerless to do much of anything, except drill the well and hope the Court would compensate him for it. And we want to say that by adopting that position we mean no reflection on Mr. Bosse. It has been a long time since the Court heard a more refreshing and honest witness or one who was more appealing as a fine businessman and one who has succeeded in doing a very difficult thing to do, that is stay in the building business and satisfy a bunch of women he is building houses for. There is nothing in this world more obnoxious or picayunish than a woman who has ordered a custom-built house and is close enough to watch it built. * * *

"In any event, we think that Mr. Koehler is entitled to recover reasonable cost of putting in a well that would seal within a reasonable time, notwithstanding the fact that the other well might have eventually sealed and eventually

have become a working, going concern. We think that the best part of a year is a sufficient allowance for a drilled well to work."

Judge Bowen was the trier of facts. He saw the witnesses. He heard them testify. Maryland Rule 886 requires us to give "due regard" to his "opportunity * * * to judge * * * [their] credibility." We cannot say that he was clearly erroneous in electing to accept the Koehlers' version of the matter. *Blank v. Dubin*, 258 Md. 678, 267 A. 2d 165 (1970).

*Judgment affirmed; appellant to pay the costs.*